Good morning, your honor. May it please the court, counsel. I'm Art Allen. I represent the appellant Prudencio Uriarte-Acosta. I'd like to reserve two minutes for rebuttal. And unless the court wishes otherwise, I'd also like to address my comments to issue one of the appellant's brief, which is the insufficiency of the evidence to support the two counts for which he was convicted. Jackson v. Virginia, to the contrary, I find it difficult to define insufficiency. Sometimes it's more like Potter Stewart said, I know it when I see it, even though I can't necessarily define it. And this court has held specifically in U.S. v. Delgado that when a defendant's act can be either innocent or it can be evidence of criminal wrongdoing, the government has to show beyond a reasonable doubt that it's the latter of the two options. In this case, the government, in its brief, pages 18 through 22, lists nine issues as to why otherwise innocent conduct should be taken as evidence of guilt. None of those nine issues, however, rules out the innocent nature. We had a drug conspiracy here. The confidential informant introduced a co-defendant, Adrian Mickle. I refer to him as Mickle in my brief. The government generally refers to him as Adrian in theirs. And he was introduced on January 13th of 2005 to the undercover officer. The first drug sale went down on January 21st. That was Mr. Mickle selling drugs, methamphetamine. The second drug deal went down on January 28th of 2005. And to try to seek out his supplier, the government bought two ounces and they said, oh, we'd like another two ounces. And they observed what happened. Well, what happened was the third co-defendant, who we'll call Esteban Cortez, is called. He goes to Mickle's house and delivers drugs. Mickle goes back to the casino and delivers the second ounces. At this point, and the government's witnesses all conceded, no one had ever heard of Mr. Uriarte at that point. On February 3rd, a larger drug amount is set up for sale. It's to be delivered again at the same casino. The undercover officer meets Mr. Mickle inside the casino. They talk for a few minutes. They go out. What has happened at this point is Mr. Mickle has arrived at the casino in a car driven by Mike Long. He gets out. He goes in. He comes back out. The undercover officers are parked a little bit further away, closer to an employee's parking lot there. Mr. Mickle gets in the car, again in a similar lineup. And then he gets out. He walks over to the undercover officer's car. He's got a 12-pack, one of these cardboard coke cases. He gets in the car. The drugs are in the coke case. At that point, he's taken into custody. The officers then go up to where my client and the co-defendant, the third co-defendant, are seated and take them into custody. That's it. There were also a bunch of phone conversations, right? Not between Mr. Mickle and my client. There were never any phone calls between them. And in fact, when Mr. Mickle left the casino and wanted the car to start moving, it wasn't my client he called. Speaking with Cortez Zavala, right? I'm sorry? Speaking with Cortez Zavala? Yes. That man? Yes. That's who he calls, not my client. They're in the car together, just as a... We don't know a record. It doesn't tell us whether the other people had driver's licenses. It doesn't tell us anything except, again, the so-called expertise of DEA agent Henry. All that my client did was drive a person to a casino in downtown Las Vegas. Drive a person to a casino who's doing a drug deal, and they say that he's driving a car that's not his own. He's driving in a manner that's consistent with, I guess, what they describe as evasive kind of drug transactions. Surveillance. So he's not just – it's not like dropping your child off at the movies, in other words. It's not consistent with that kind of drive and drop off. So the question I have is that, you know, you're correct that if you slice it thin enough, each thing could be viewed as an innocent act. I think that's your argument. The question is, if you have all these things cumulative together, cannot they constitute circumstantial evidence sufficient to sustain a conviction? Undoubtedly, Your Honor, and I certainly can't dispute that. But do they have proof beyond a reasonable doubt that any rational jury... ...whether any reasonable juror could conclude that the cumulative evidence is sufficient to convict? But... Yes. I'm sorry, I didn't mean to interrupt you, Your Honor. What I didn't concede, though, was going back to when there are two explanations for innocent conduct. If he had been a cab driver and dropped Mr. Mitchell off, the government would make – could make the same argument. The driving slowly through a parking lot at a casino in Las Vegas... None of the government – that's like dropping your kid at the movies. None of the government wouldn't have these other entangled conduct with the phone calls and the car and that sort of thing. So the cab driver is a great example of a true drop off. And your client seems to have quite a few facts that make him not a cab driver. First of all, going back to the phone calls with Mr. Sanford, Your Honor, if the court will recall from the record... This was – there were two cell phones taken from my client at the time of the arrest. Neither – and the government argues this as evidence of guilt – neither were in his name. Now, unfortunately, defense counsel at the trial level failed to develop perhaps answers to that. But there is no evidence that he was in possession of either of those cell phones prior to February 3rd, the day of the arrest. So that's somewhat of a straw man argument that the government makes there regarding the cell phones. But can I ask you – this just complicates it a little further, and I'm trying to struggle with this. We're in a situation here where up to now we've been talking about the normal standard on which one would evaluate a jury verdict. You know, that's going to be Virginia and whether any reasonable juror could find the person guilty, as you have emphasized, beyond a reasonable doubt. This case has one other twist on it, and that is the failure to make a Rule 29 motion. My question, which I don't think seems too clear from our cases, is we then recite what the standard is when you fail to make a Rule 29 motion. But how does that get integrated with the argument you're making? In other words, he has like one more hurdle to jump over, but how high is that hurdle, or is it an indistinguishable hurdle? It is a higher hurdle, Your Honor, because unfortunately, I'll only say, as I said in my brief, that his trial counsel's actions were inexplicable. It raises it to a plain error level. However, I believe in this case a conviction based upon insufficient evidence is clearly plain error. There is error. It's plain. It has affected substantial rights of my client. And unless the Court has another question, I'd like to reserve my time for rebuttal. Thank you, Your Honor. Thank you. Good morning, Your Honors. Peter Levitt for the United States Appellee. The evidence in this case, viewed in its totality and in the light most favorable to the United States, amply supports the verdicts. Addressing directly Your Honor's question regarding the applicable standard of review in the wake of the absence of a Rule 29 motion, it seems to me that the standard for review in the absence of such a motion is whether it's manifest injustice from the jury's returning of the verdict, which in this case they did in 56 minutes between 4.18 and 5.14 p.m. It seems that viewing the evidence in the totality and in the light most favorable to the United States is a slightly less of a hurdle to leap over. But I argue in this case that the jury's returning of the verdict of guilt on the two counts, given the welter of evidence in this case, satisfies either standard. Counsel, just so we're clear, I don't recall the government taking advantage of the absence of a Rule 29 motion and arguing for a higher standard of review. In fact, the standard review you proposed in your brief is just a sufficiency standard. Correct, Your Honor. Any reason why we shouldn't hold you to that? And I relish being held to that, Your Honor, based on that standard of review. I relish that opportunity. And with that adjective in our rearview mirror, I'll turn to the evidence. In this case, we have, unlike in Lopez, unlike in Sanchez-Mata, and unlike in Penagos, we have toll evidence connecting this defendant to the co-conspirators before the arrest on February 3rd. In between January 15th and February 3rd, we had 32 telephone calls back and forth from the defendant in this case and Esteban Cortez-Savalza. In addition to that, on January 28th, this was the second deal with Adrian Michel Figueroa. And on that date, the undercover officer, after he purchased the two ounces of methamphetamine from Adrian, the undercover asked to purchase two more. What happened after that? One minute later, Adrian Michel Figueroa called Esteban Cortez-Savalza. But 14 minutes after that, Esteban Cortez-Savalza, the middleman, called defendant Prudencio Uriarte. He called this defendant in between the first two-ounce sale on the 28th and the second two-ounce sale on the 28th. So we have toll evidence. We also have the fact that in our case, Uriarte was the driver of the vehicle. In Lopez, in Penagos, in Sanchez-Mata, the defendant was merely present in a passenger role. In our case, we have the defendant establishing, after dropping Adrian and the 1.1 kilos of methamphetamine off at the undercover vehicle, this defendant, Uriarte, immediately leaves and establishes a monitoring post from which he can watch the undercover vehicle, which he knows contains Adrian Michel Figueroa and the 1.1 kilograms of methamphetamine. After the defendant sees and certainly hears the arrest of Adrian Michel Figueroa, he attempts to flee. He attempts to flee, but he's boxed in by Agents Cadigan and Group Supervisor Bustos. That's another factor that the jury could and apparently did consider. At the time and the place of the actual deal, this is something that in Ninth Circuit precedent is reiterated, and it would be distinguished from Penagos, Lopez, and Sanchez-Mata, in that in this case, we didn't have a situation where, say, in Penagos, Mr. Penagos was merely looking up and down the street as Guerin and Gonzalez were transferring narcotics from the Duster to the Monte Carlo. Rather, we have this defendant engaged in his counter-surveillance driving at the moment of the drug transaction, at the moment when Adrian and the carton of Coca-Cola containing the 1.1 kilos are dropped off at the undercover vehicle to do the deal. We also have the defendant with two cell phones registered in bogus, fictitious names. He's driving a vehicle registered to another person. The totality of these circumstances was brought into even sharper focus by the expert testimony. And the expert testimony underscored the sheer implausibility of a civilian who had no idea of what was going on being present at a 1.1 kilo methamphetamine deal. This could turn into 26,000 individual user doses when broken down and sold on the street. If you don't know, you don't go. So this totality of the evidence, viewed in the light most favorable to the United States, could amply support the jury's verdict, and that's precisely what happened. Counsel, can you explain the purpose of the screensaver, given that I guess Jesus Calverde, as the government now concedes, someone who isn't necessarily associated with narcotic trafficking? Well, the relevance, Your Honor, is that there was testimony elicited on direct examination of Agent Cadigan to the effect that in Agent Cadigan's experience, Malverde was known as the patron saint of drug trafficking. On cross-examination, and defendant hammered home on this point repeatedly, innocent explanations for Malverde were posited. The Malverde evidence was thus relevant. Given that it's a textbook way to sell, you see that it obviously is a problem. I think that's the question. Well, Your Honor, I'd respectfully disagree with you. I think it's probative. I haven't expressed any views. I just got the question. It's probative, Your Honor. It's not dispositive, but it's probative of an issue that the defendant has squarely placed before the jury. Now, was he a knowing participant in a drug transaction, or was he a mere stooge who happened to be driving around to a Las Vegas parking lot in the middle of the night, having no idea what was going on? Counsel, counsel, I find it very difficult to tie this to knowledge. It looks to me it might be propensity knowledge, which you shouldn't allow. What knowledge? What's the knowledge tie-in? Well, Your Honor, first of all, I believe that the knowledge tie-in flows from the fact that the patron saint of drug trafficking is relevant to knowledge and relevant to a mere presence defense. It's as relevant, as Judge Trott pointed out in dicta in the Curtin opinion, as a copy of the great train robbery would be in a case involving a train robbery. So it's probative of knowledge. It's not dispositive. And I would emphasize, Your Honor, that the Jesus Malverde screensaver evidence was wholly unobjected to below. So we're viewing it through the prism of plain error review at this juncture. We're not asking whether had a timely objection been made, whether the district court would have or would have not let it in, and if he had, whether he would have done so with a limiting instruction. Rather, we're asking whether there was error, whether it was plain, whether it affected substantial rights, and conceding those three things, for the sake of argument, whether the error seriously affects the fairness, integrity, and public reputation of these proceedings. And it clearly does. I guess, Counsel, I would more be considering whether the government is overstating its case. I don't think there was great wisdom in the government using this evidence. I ‑‑ the point is taken, Your Honor. And had we known this was going to become an issue on appeal, we perhaps would not have done so. But in any event, the public integrity of these proceedings was not seriously affected by the government's eliciting several answers on direct examination about this witness. In fact, the United States had to point out in its closing argument, excerpts of record page 258, that Jesus Malverde was the least influential piece of the puzzle. The piece of the puzzle that viewed in its totality showed the defendant's knowledge. Thank you. Thank you, Your Honor. Just very briefly, on the counter‑surveillance issue again, if the court will refer to the excerpts of record at page 74, it will note in there that Agent Cardigan testified that as he's driving around following the so‑called surveillance by my client, he's not even noticing that he's driving a silver car, which incidentally is registered to the same person that the co‑defendant Esteban Cortez's car is registered to. I believe it's a family member of Mr. Esteban. So, in effect, the owner of that car was in there as a passenger. Just also very briefly, touching on the Jesus Malverde issue, this was the equivalent during trial of the government accusing my client of being a devil worshiper. Instead, they couched it in terms of he has on a cell phone the image of a Mexican drug dealer. And they floated it out. They didn't think it was important. They say today it came from their first witness. It was mentioned twice in closing argument. And they, again, in their brief before this court, submitted as one of the factors that evidenced my client's guilty knowledge here. And the government, I almost understood in their argument to concede error on that point. And, unfortunately, the trial counsel didn't object. Once again, Your Honor, I suspect that may be discussed later, depending on this court's ruling on the case. We appreciate your argument. Thank you. Thank you, Your Honor. Thank you, counsel, for your argument this morning. The case just argued of United States v. Puyallup-Costa is submitted.
judges: Fletcher, McKeown, Gorsuch